# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * *
TORI SMITH,                         *
                                    *
                                    *   No. 19-412V
            Petitioner,             *   Special Master Christian J. Moran
                                    *
v.                                  *
                                    *   Filed: January 22, 2021
SECRETARY OF HEALTH                 *
AND HUMAN SERVICES,                 *   Entitlement, Bell's palsy, postural
                                    *   orthostatic tachycardia syndrome
            Respondent.             *   (POTS), severity requirement
* * * * * * * * * * * * * * * * * * *
```

Joseph Mooneyham, Mooneyham Berry & Karow, LLC, Greenville, SC for petitioner;
Althea Walker Davis, United States Dep't of Justice, Washington, DC for respondent.

### DECISION DENYING COMPENSATION[1]

Tori Smith alleges that an influenza vaccination caused her to suffer Bell's palsy and postural orthostatic tachycardia syndrome ("POTS"). She seeks compensation pursuant to the National Childhood Vaccine Injury Compensation Program.

Relatively early in her case, Ms. Smith filed a motion for a ruling that she was entitled to compensation. The Secretary opposed this motion for both procedural and substantive objections. Procedurally, the Secretary noted that Ms.

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website. This posting will make the decision available to anyone with the internet. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

Smith had not filed all medical records and requested that Ms. Smith obtain missing records. Substantively, the Secretary argued that Ms. Smith had not met her burden to show the flu vaccine caused either Bell's palsy or POTS. Additionally, the Secretary maintained that Ms. Smith did not meet the severity requirement in the Vaccine Act.

Ms. Smith filed additional medical records, remedying any procedural problem. However, the Secretary argued that the more recently filed records do not show that Ms. Smith suffered her injury for more than six months. The Secretary's point is well-taken. Ms. Smith has not demonstrated that her Bell's palsy or POTS lasted more than six months. Thus, her petition is dismissed.

I. **Events in Ms. Smith's Life**[2]

Relevant events can be divided into three broad periods: Ms. Smith's health before vaccination, Ms. Smith's health from vaccination to six months after vaccination, and Ms. Smith's more recent health.

   A. **Before Vaccination**

Ms. Smith was born in 1977. Exhibit 1. According to histories given to multiple providers, she experienced three episodes of Bell's palsy with the most recent episode before vaccination occurring while she was in college. See exhibit 2 at 5 (report to Dr. Mitchell on Nov. 22, 2017); exhibit 9 at 5 (Dr. Wilbourn's Dec. 6, 2017 report); exhibit 6 at 1 (Dr. White's Dec. 12, 2017 report).

In March 2009, she was evaluated for atypical chest pain and tachypalpitations that usually occurred during exercise. Exhibit 3 at 45. Similarly, Ms. Smith told a doctor in March 2018 that some of her "tachycardic symptoms may be preexisting" and related to anxiety which she suffered before the vaccination. Exhibit 30 at 8.

   B. **Vaccination to Six Months Later**

Ms. Smith received a flu vaccination at GHS employee health on October 11, 2017. Exhibit 1. Her employer required the flu vaccination as a condition of employment, and she received benefits through the Workers' Compensation system. Pet. ¶ 11.

---

[2] Although Ms. Smith's petition presents an abbreviated chronology, she filed medical records after the petition. The Secretary summarized medical records thoroughly in the his two briefs responding to Ms. Smith's motion for a ruling on the record.

Ms. Smith saw Dr. Andrew Herman, D.C., at Easley Family Chiropractic for the first time on October 30, 2017. Exhibit 28 at 10. During this appointment, Dr. Herman noted "very tolerable intermittent, radiating, aching and dull pain, rating a 3 on a 0-10 scale" in the "cervical and head, radiating to" the left and right arms. Id. Ms. Smith also complained of jaw and neck pain and pain in both arms at this visit. Id. Dr. Herman performed cervical and thoracic spine adjustments, and Ms. Smith saw him for eight additional sessions through November 28, 2017. See Exhibit 28.

On November 22, 2017, Ms. Smith saw Dr. Cory Mitchell for pain on the left side of her face, including her eye and neck, and a headache behind her left eye. Exhibit 2 at 5. At this visit, Ms. Smith also complained of left-sided facial weakness. Id.

On November 27, 2017, Ms. Smith saw Dr. Anne Meade. Dr. Meade noted that Ms. Smith's left-sided facial weakness had improved, but she was "still experiencing headaches and dizzy spells." Exhibit 2 at 7. She also reported facial twitching, but the notes from this appointment do not specify on which side of the face this twitching occurred. Id. Dr. Meade's assessment included facial droop, Bell's palsy, elevated blood pressure reading, right ear pain, and TMJ (temporomandibular joint disorder). Id. at 8.

Ms. Smith again saw Dr. Mitchell on December 1, 2017. At this appointment, she presented with "improving" left-sided facial weakness, ear pain, and headache. Exhibit 2 at 10. Dr. Mitchell's assessment included pharyngitis, an enlarged pituitary gland, sinusitis, and improving Bell's palsy. Id. at 11.

Ms. Smith saw neurologist Dr. Rance Wilbourn of GHS Neurosciences on December 6, 2017, for headaches and Bell's palsy. Exhibit 9 at 5, 10. Dr. Wilbourn noted a differential diagnosis of reaction to flu shot and viral process. Exhibit 9 at 10. In his notes, he stated that Ms. Smith's symptoms would continue to improve and that "supportive treatment was what [petitioner] needs." Id. Dr. Wilbourn advised Ms. Smith to discontinue her use of Vyvanse. Id. With respect to his notes regarding the vaccine, he felt that her condition "most likely represents a reaction to her flu shot. She does not wish to receive flu shots in the future. I feel this is likely appropriate in this case." Id.

On December 8, 2017, two days after her appointment with Dr. Wilbourn, Ms. Smith saw physician assistant Kate Nattier at Brio Internal Medicine. At this appointment, Ms. Smith complained that she felt like her "body is shutting down." Exhibit 2 at 14. She complained of nausea, vomiting, shortness of breath, and dizziness. Id. She reported that she felt "totally fine before she got the flu

3

vaccine" and that since then, she had suffered Bell's palsy, felt "very fatigued," had pressure in her ears and temples, had bloating and gas, nausea, dizziness with changing positions. Id. Ms. Nattier referred Ms. Smith to Upstate Cardiology for evaluation of palpitations. Id. at 15. She also recommended that Ms. Smith obtain a Holter monitor as soon as possible for evaluation of possible POTS. Id. Ms. Smith returned for a one-week follow-up with Ms. Nattier on December 15, 2017. Exhibit 2 at 21. At this appointment, Ms. Smith reported that her "face started breaking out on Monday and each day since then she felt like she was having Bell's palsy symptoms again." Id.

On December 22, 2017, Ms. Smith was taken to the emergency room at St. Francis Downtown, for "recurrent tachycardia and feeling short of breath with exertion or talking." Exhibit 10 at 11.

Five days later, on December 27, 2017, Ms. Smith returned to Dr. Mitchell for a blood pressure check and for a follow-up regarding her Bell's palsy, which Dr. Mitchell noted as "from [her] flu vaccine." Exhibit 2 at 24. Ms. Smith complained of multiple new symptoms since her vaccination and reported that the rash she presented with at the last visit with Dr. Mitchell "is going away and her [B]ell's palsy symptoms are resolving." Id. She reported that she had been to a cardiologist, who "did an echo [and] now doing holter." Id. She further reported having three more episodes of tachycardia and hypertension with "multiple [emergency department]/urgent care visits." Id. Dr. Mitchell noted that "[l]aying flat and IV fluids seems to help. [She] ha[d] lots of dizziness with standing, [was] constantly thirsty, [and had] significant fatigue." Id. Ms. Smith told Dr. Mitchell at this appointment that she was concerned about POTS, which Dr. Mitchell noted as a "likely diagnosis." Id. He noted that Ms. Smith had an upcoming appointment "with EP" and asked petitioner to "mention this to them so they can rule everything else out and possibly do tilt-table testing" to establish the diagnosis and begin treatment. Id. Dr. Mitchell ultimately diagnosed Ms. Smith with tachycardia at this appointment. Id. at 25.

Ms. Smith saw cardiologist Dr. Matthew Sellers on December 29, 2017, on referral from his partner, Dr. Bittrick, for evaluation of tachycardia. Exhibit 3 at 6. Ms. Smith reported that she "was in good health until she got the flu shot in October," and that "[s]he subsequently developed Bell[']s palsy." Id. At this appointment, Dr. Sellers noted that she presented with "tachycardia" and "[shortness of breath] with exertion and having problems only when standing and walking." Id.

On January 8, 2018, Ms. Smith again saw neurologist Dr. Wilbourn for follow-up for headaches and Bell's palsy. Exhibit 9 at 19. Dr. Wilbourn noted

4

that she had "developed orthostatic hypotension with presyncopal spells"; he did not indicate when these symptoms began. Id. at 20. Dr. Wilbourn conducted a detailed neurologic exam, which did not show any focal deficits. Id. His differential diagnosis included "POTS, reaction to the flu shot, [and] viral process." Id.

Two days later, on January 10, 2018, she was seen at the Greenville Memorial Hospital emergency room where she presented with nausea, vomiting, and a near-syncopal episode. Exhibit 7 at 17. Ms. Smith again attributed the onset of her symptoms to her flu vaccination, stating that "[h]er symptoms began after a flu shot in September and have persisted." Id. Ms. Smith was treated with IV fluids and Zofran. She was discharged upon improvement in her symptoms. Id. at 15-23.

Ms. Smith underwent tilt-table testing on January 15, 2018, at St. Francis Downtown with Dr. Sellers. Exhibit 10 at 32. The post-procedure diagnosis indicates an "abnormal tilt-table test" and Dr. Sellers noted that the test results were "consistent with POTS." Id. at 33.

On January 28, 2018, Ms. Smith returned to Upstate Cardiology for an appointment with Dr. Bittrick. There, she complained of shortness of breath, palpitations, and tachycardia. Exhibit 3 at 19. On review of systems, Ms. Smith had no chest pain or shortness of breath. Id. at 20. On exam, she had a normal heart rate with a regular rhythm. Id. at 21. Dr. Bittrick noted that petitioner had tried Florinef "with no good results." Id. at 19. He assessed petitioner with tachycardia, shortness of breath, and palpitations. Id. at 22. He noted that her "current medical regimen is effective" and recommended that she "continue with [her] present plan and medications." Id. He also noted that "[h]er POTS seems to have burned out." Id. at 19. At a follow-up visit the next day, cardiologist Dr. McCotter assessed her again with tachycardia, noting Dr. Sellers's diagnosis of POTS, but added that Ms. Smith's condition appeared to have an "anxiety component."   Exhibit 3 at 17.

Between February 4, 2018, and March 5, 2018, Ms. Smith received home health visits for IV fluids, physical therapy, and speech therapy through Interim Healthcare of the Upstate. Exhibit 8. She also underwent a speech therapy evaluation with Katie Gernat on February 15, 2018. Exhibit 8 at 53. Ms. Gernat noted that Ms. Smith "no longer notices any weakness in facial muscles originally caused by the Bell[']s Palsy." Id. at 54. Ms. Smith reported difficulty with swallowing and getting food down due to a feeling "as if the food is stuck." Id. Ms. Gernat recommended a mechanical soft diet and speech therapy. Id. Ms. Smith again attended speech therapy on February 20 and 22, 2018, and was

discharged after meeting all goals on February 28, 2018.  Id. at 55-66.  Soon after, on March 5, 2018, Ms. Smith was also discharged from home health care, after meeting all physical therapy goals.  Id. at 67-68.

### C. Events occurring after March 2018

On May 18, 2018, Ms. Smith saw Dr. Joseph Kratzer at GHS Neuroscience for a follow-up regarding her history of Bell's palsy and POTS.  Exhibit 9 at 67.  Dr. Kratzer noted Ms. Smith's prior treatment from Dr. Wilbourn, stating that Dr. Wilbourn had seen Ms. Smith "for a self limited Bell's Palsy in December of last year and then saw her in follow up some time later where he documented her known POTS which is treated elsewhere."  Id.  Dr. Kratzer also noted Ms. Smith's headaches and fatigue.  Id.  During this appointment with Dr. Kratzer, Ms. Smith reported ongoing "very mild headaches though they are much milder than before. . . . Her headaches are still left-sided."  Id. at 68.  She also reported that "[h]er dizzy spells are much better since she has increased her fluid intake (due to POTS)."  Id.  Dr. Kratzer's neurologic examination produced normal results.  Id. at 71-72.  Dr. Kratzer's assessment was that Ms. Smith "is doing much better in general with regards to her headaches."  Id. at 73.  He would see her in follow up as needed.  Dr. Kratzer's assessment did not mention either Bell's palsy or POTS.  Id.

## II. Procedural History

Represented by attorney Mooneyham, Ms. Smith filed her petition on March 18, 2019.  She maintained that her Bell's palsy and POTS "were caused by the influenza vaccination administered on October 11, 2017."  Pet. ¶ 9 (citing exhibit 4 at 2).  She further alleged her conditions lasted more than six months.  Id. ¶ 10 (citing exhibit 9 at 63).

With her petition, Ms. Smith filed medical records.  She simultaneously represented that she had submitted all required medical records.  See Pet'r's Statement of Completion, filed Mar. 18, 2019.

An initial status conference was held on April 22, 2019.  Ms. Smith was directed to file additional information, particularly with respect to her claim for workers' compensation benefits.  Ms. Smith added this material to the record.  Ms. Smith also identified treating doctors who supported her claim that the flu vaccine caused her Bell's palsy and/or POTS.  Pet'r's Status Rep., filed May 16, 2019.

The Secretary represented that he would not review the medical records for more than seven months.  Resp't's Status Rep., filed Aug. 26, 2019.  Thus, a status conference was held to discuss whether Ms. Smith wanted to wait for the Secretary

to complete this review.  Other options were for Ms. Smith to obtain a report from an expert or to file a motion for a ruling on the record.  Ms. Smith was advised that if she sought a ruling on the record, then the Secretary's deadline for responding to that motion would be set by the Vaccine Rules.  Order, issued Sep. 16, 2019.

Ms. Smith opted to seek a ruling on the record.  Citing records from eight health-care professionals, Ms. Smith maintained that the flu vaccine caused her Bell's palsy and her POTS.  Pet'r's Mot., filed Sept. 25, 2019.  This motion was two pages in length and did not discuss the standards of adjudication or the elements of compensation, other than causation.

Without seeking any enlargements of time, the Secretary responded.  The Secretary's summary of medical records comprised approximately eleven pages.  As previously noted, the Secretary requested that Ms. Smith provide many medical records.  The Secretary also challenged Ms. Smith's proof regarding two elements of compensation: causation and severity of injury.  Resp't's Resp., filed Oct. 9, 2019.

Ms. Smith offered to obtain the records the Secretary had requested.  Pet'r's Reply, filed Oct. 18, 2019.  Ms. Smith also argued that the statements from the treating doctors satisfied her burden to show causation.  To establish that her injury lasted more than six months, Ms. Smith cited the records from Dr. Kratzer, see exhibit 9 at 63-77, and her testimony from a deposition in the workers' compensation proceeding, see exhibit 14.

Following the submission of Ms. Smith's reply, a status conference was held to discuss the filing of the requested medical records.  Ms. Smith eventually added more medical records.  Exhibits 22-32.  The Secretary accepted the completeness of Ms. Smith's submission.  Resp't's Status Rep., filed July 2, 2020.

With the additional material in hand, the Secretary re-addressed Ms. Smith's motion for ruling on the record.  The Secretary maintained his previous position.  The Secretary argued that the statements from various treating doctors did not carry Ms. Smith's burden regarding causation.  The Secretary also contended that Ms. Smith did not demonstrate that her Bell's palsy or POTS lasted more than six months.  Resp't's Supp'l Resp., filed Sept. 17, 2020.

Ms. Smith was given an opportunity to file a reply.  Order, issued Sep. 21, 2020.  Her submission, however, simply referred to earlier arguments.  Pet'r's Supp'l Reply, filed Oct. 19, 2020.  Ms. Smith's reply makes the case ready for adjudication.

## III. Standards for Adjudication

Petitioners are required to establish their cases by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

To receive compensation, petitioners must establish five elements. 42 U.S.C. § 300aa–11(c)(1)(A) through (E); 42 U.S.C. § 300aa–13(a)(1)(A) (authorizing special masters to award compensation when petitioners establish items listed in section 11(c)(1)). The fourth element concerns the severity of injury. Petitioners may meet this element by establishing that their injury lasted more than six months.[3] The failure to establish six months of injury results in a denial of compensation. See Starvridis v. Sec'y of Health & Human Servs., No. 07–261V, 2009 WL 3837479, at *4 (Fed. Cl. Spec. Mstr. Oct. 29, 2009); Song v. Sec'y of Health & Human Servs., No. 92-279V, 1993 WL 534746 (Fed. Cl. Spec. Mstr. Dec. 15, 1993), mot. for rev. denied, 31 Fed. Cl. 61 (1994), aff'd, 41 F.3d 1520 (Fed. Cir. 1994) (table).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition. 42 U.S.C. § 300aa–11(c)(2). Medical records that are created contemporaneously with the events they describe are presumed to be accurate. Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

## IV. Analysis

Here, whether Ms. Smith suffered a vaccine-induced injury for more than six months is dispositive.[4] Preponderant evidence shows that Ms. Smith recovered from both Bell's palsy and POTS within six months.

---

[3] The Vaccine Act also allows a petitioner to receive compensation if either the vaccinee died or the vaccinee underwent a surgical procedure. However, Ms. Smith did not die and has not undergone a surgery for her reaction to the vaccine.

[4] As mentioned earlier, the parties dispute whether evidence from treating doctors carried Ms. Smith's burden on causation. Due to the outcome on severity, the issue of causation is not reached.

### A. Bell's palsy

About six weeks after the flu vaccination, Ms. Smith reported left-sided facial weakness, which Dr. Meade also described as "drooping." Exhibit 2 at 5 (Nov. 22, 2017). Dr. Meade diagnosed Ms. Smith with Bell's palsy on November 27, 2017. Id. at 7.

From this point forward, medical records mention Bell's palsy periodically. Dr. Mitchell determined on December 1, 2017, that Ms. Smith's Bell's palsy was "improving." Exhibit 2 at 10-12. Dr. Wilbourn, a neurologist, anticipated that Ms. Smith's symptoms, including those associated with Bell's palsy would continue to improve and recommended supportive treatment. Exhibit 9 at 10 (Dec. 6, 2017).

However, on December 8 and 15, 2017, Ms. Smith reported that the Bell's palsy was worsening. Exhibit 2 at 14, 21 (both with physician's assistant Nattier). Any worsening appears not to have lasted for long as Dr. Mitchell found upon re-examination that the Bell's palsy symptoms were resolving. Exhibit 2 at 24 (Dec. 27, 2017). During this December 27, 2017 visit, Ms. Smith expressed a concern about POTS. Id. It appears that after the December 27, 2017 visit, Ms. Smith sought treatment for POTS more frequently. While some reports from other doctors after December 27, 2017, include Bell's palsy as part of Ms. Smith's medical history, they do not report any on-going problems. The lack of documentation is noticeable because Ms. Smith's appointments with many doctors at multiple institutions gave her plenty of opportunity to communicate a concern about Bell's palsy as she had done at previous appointments.

In reply to the Secretary's argument that she had not shown six months of injury from Bell's palsy, Ms. Smith pointed to Dr. Kratzer's May 18, 2018 report. Pet'r's Reply at 12. While Dr. Kratzer was seeing Ms. Smith in follow up due to a history of Bell's palsy and POTS, his report does not document any active problems from Bell's palsy. For example, he does not say that Ms. Smith's facial muscles were weak or drooping. See exhibit 9 at 67.

For these reasons, Ms. Smith has not established, by preponderant evidence, that her Bell's palsy lasted longer than six months. Cf. Mailangkay v. Sec'y of Health & Human Servs., No. 18-36V, 2019 WL 2419553 (Fed. Cl. Spec. Mstr. May 14, 2019) (noting tentative finding that petitioner's Bell's palsy did not last six months).

### B. POTS

While the evidence that Ms. Smith's Bell's palsy lasted fewer than six months is clear, the evidence regarding the duration of her POTS is more

9

ambiguous. However, for the reasons explained below, Ms. Smith has not met her burden of presenting preponderant evidence that her POTS met the Vaccine Act's severity requirement.

The earliest suspicion of POTS seems to be based upon reports Ms. Smith provided to physician assistant Nattier on December 8, 2017.[5] Ms. Smith informed Ms. Nattier that she had, among other problems, dizziness with changing positions. In response, Ms. Nattier recommended a Holter monitor to evaluate for possible POTS. Exhibit 2 at 14.

About two weeks later, Ms. Smith sought medical attention from the emergency department of St. Francis Downtown Hospital. Ms. Smith reported recurrent tachycardia. Exhibit 10 at 11 (Dec. 22, 2017). The doctors noted that Ms. Smith had "inappropriate sinus tachycardia" and referred her for a cardiology follow-up. Id. at 13.

Ms. Smith reported more instances of tachycardia when she saw Dr. Mitchell on December 27, 2017. Ms. Smith also stated that she had "lots of dizziness with standing." Exhibit 2 at 24. Dr. Mitchell suspected that Ms. Smith might have POTS and recommended that Ms. Smith pursue a tilt-table test in her upcoming visits with other providers.

After intervening appointments during which Ms. Smith described other episodes of tachycardia, she underwent the tilt-table test on January 15, 2018. Dr. Sellers interpreted this test as abnormal. Exhibit 10 at 32; exhibit 24 at 107-17.[6]

Ms. Smith's POTS, however, seems not to have lasted very long. Dr. Bittrick, a cardiologist, stated on January 29, 2018, that "[h]er POTS seems to have burned out." Exhibit 3 at 22. Dr. Bittrick's conclusion seems consistent with the set of records home health aides generated from February 4, 2018, to March 5, 2018. Although Ms. Smith received various types of therapies, none of the people seeing her recorded any complaints about tachycardia. Similarly, while Ms. Smith went to doctor's offices and emergency rooms in December 2017 and January

---

[5] In March 2018, Ms. Smith informed a doctor that some of her "tachycardic symptoms may be preexisting" and related to anxiety which she suffered before the vaccination. Exhibit 30 at 8. However, it appears that Ms. Smith was not diagnosed with POTS before the vaccination. Ms. Smith testified that she did not suffer symptoms of POTS before the vaccination. Pet'r's Reply at 7, 11 (citing exhibit 14 (deposition transcript) at 35.

[6] Based upon the limited information Ms. Smith provided initially, the Secretary maintained that he could not take a position regarding the accuracy of the diagnosis of POTS. Resp't's Resp. at 17, 22. But, after Ms. Smith filed additional information, including exhibit 24, the Secretary accepted the POTS diagnosis. Resp't's Supp'l Resp. at 5.

10

2018 because she was having tachycardia and/or dizziness, there is an absence of records from those places for February, March, or April 2018.

To meet the six-month requirement, Ms. Smith cites two items of evidence: Dr. Kratzer's May 22, 2018 report and her deposition. Pet. ¶ 10; Pet'r's Reply at 12. Neither constitutes persuasive evidence.

Dr. Kratzer describes Ms. Smith's medical history as "a self[-]limited POTS in December of last year." Exhibit 9 at 67. The limited nature of Ms. Smith's POTS as Dr. Kratzer described it is consistent with the report from Dr. Bittrick. Dr. Kratzer did not diagnose Ms. Smith as having on-going POTS. This lack of notation undermines Ms. Smith's argument that Dr. Kratzer's report helps her fulfill her burden of establishing an injury lasting more than six months.

Ms. Smith also relies upon testimony in a June 28, 2018 deposition she gave in the context of her claim for workers' compensation benefits. The portion Ms. Smith cites consists of a single question and answer:

> Q   And what do you do on a daily basis to keep yourself busy?
>
> A   Daily basis, it's just trying to manage the POTS. So, increased fluid intake. I have to eat every two to three hours. I have to exercise as part of my physical therapy and then, just rest breaks and I try to live as normal life as possible. And if I can go to church, I go to church. If I can't, I don't.

Exhibit 14 at 55.

The Vaccine Act prevents a special master from making a finding based upon "the claims of a petitioner alone, unsubstantiated by medical records or medical opinion." 42 U.S.C. § 300aa–13(a)(1). The need for medical records to document an existing medical condition is sensible. If petitioners could establish that they suffered from a medical problem simply by testifying that they suffered from a medical problem, then the Vaccine Act's requirement would become almost meaningless. See Armbruster v. Sec'y of Health & Human Servs., No. 17-1856, 2020 WL 3833396, at *11-12 (Fed. Cl. Spec. Mstr. Feb. 5, 2020) (declining to credit petitioner's affidavit in opposition to a motion for summary judgment). This case is particularly instructive here because, like Ms. Smith, the petitioner in Armbruster asserted that evidence of personal maintenance related to an alleged ongoing injury amounted to evidence of treatment related to an ongoing injury. Id. at *11. In that case, there was no medical record evidence of treatment or medical

11

attention showing an ongoing condition.  Id.  Here too, Ms. Smith's lone medical record from Dr. Kratzer that she offers as evidence contains no record of ongoing treatment of diagnosis of POTS.  This leaves Ms. Smith's deposition testimony which, as explained above, cannot alone carry her burden of proving the six-month severity requirement.

## V.     Conclusion

After Ms. Smith filed a motion for a ruling on the record, the Secretary opposed this claim because, in part, Ms. Smith did not fulfill the Vaccine Act's requirement that an injury last more than six months.  Ms. Smith filed additional information.  However, the record, taken as a whole, does not permit a finding that Ms. Smith carried her burden on this point.  Accordingly, the Clerk's Office is instructed to enter judgment against Ms. Smith unless a timely motion for review is filed.

**IT IS SO ORDERED**.

s/Christian J. Moran
Christian J. Moran
Special Master